**STUBBS v. FULTON NAT. BANK OF ATLANTA.**

**FULTON NAT. BANK OF ATLANTA v. STUBBS.**

**In re AMERICAN BOND & SHARE CORPORATION.**

**No. 10908.**

Circuit Court of Appeals, Fifth Circuit.

Jan. 6, 1945.

six loans with the Fulton National Bank of Atlanta, Georgia, in the name of its president, B. R. Bradley, and had transferred to the bank various stocks and bonds as collateral security for said loans. These loans were paid in full between January 25 and August 15, 1934, and the securities were returned by the bank to Bradley from whom they were received.

As trustee of the bankrupt, Stubbs brought these proceedings under Section 70, sub. e, of the Bankruptcy Act of 1898, 11 U.S.C.A. § 110, sub. e, and under Section 28-201 of the Georgia Code, to set aside all transfers from the bankrupt to Fulton National Bank on the ground that they were made with intent to defraud creditors of the bankrupt under State law. Count 1 of the bill was to set aside each transfer of securities to the bank as collateral for each loan made, and count 2 was to set aside the transfer of funds to the bank to pay said loans. A master was appointed who found that the trustee was entitled to recover on count 1 the sum of $87,864.12, plus interest from the time of the transfers, such amount being the value of the securities at the time of transfer, on all loans except the first loan; and the master found that if the trustee elected to recover under count 2, he was entitled to recover the sum of $120,297.72, plus interest, being the aggregate of all payments to the bank in liquidation of said loans.

Following a hearing on objections to the master's reports, the District Judge found against the trustee and denied recovery under count 2, holding that all six loans were valid loans and the transfer of funds to the bank to repay the same was not in fraud of creditors. He also found against the trustee on the transfer of securities to secure the first four loans, attacked in count 1, on the ground that these transfers were received in good faith by the bank and were not, as to it, in fraud of creditors. With reference to the transfer of collateral to secure the fifth and sixth loans, he found in favor of the trustee on the ground that, when the transfer of the collateral was made, the bank had constructive knowledge of the purpose of the bankrupt to defraud its creditors. He fixed the value of the securities transferred to secure the last two loans at the highest proven value between the date of the transfer and the filing of suit, and, in keeping with the measure of damages under Georgia law in trover actions, gave judgment against the bank.

Madison Richardson and Clarence H. Calhoun, both of Atlanta, Ga., for appellant and cross-appellee.

Marion Smith and Devereaux F. McClatchey, both of Atlanta, Ga., for appellee.

W. A. Sutherland, of Atlanta, Ga., for amicus curiae.

Before HOLMES, McCORD, and LEE, Circuit Judges.

LEE, Circuit Judge.

The American Bond & Share Corporation, a Georgia corporation, was declared a bankrupt in April, 1935, and Thomas M. Stubbs was appointed successor trustee. Between December 31, 1933, and June 1, 1934, both dates inclusive, it had negotiated

in favor of the trustee in the sum of $45,-959.74, with interest from the date of the decree. This amount by stipulation was reduced to $45,225.34 to correct an error in addition. The trustee appealed from the judgment to the extent that it denied recovery under count 2 for the transfer of funds to repay the loans and denied recovery under count 1 for transfers of securities to secure the first four loans. The bank cross-appealed from the judgment against it in the sum of $45,225.34.

■■ Few, if any, of the primary facts are in dispute. The dispute has to do with the inferences or conclusions drawn from the facts.[1] The bankrupt was organized in 1931. In 1932 Bradley acquired the controlling interest in said corporation and became its president and moving spirit, and shortly thereafter it engaged in the business of trading upon the exchanges with money and securities deposited with it by numerous customers under two contracts, a power of attorney agreement and a hypothecation card. Under the power of attorney agreement, the corporation, its officers, agents, substitutes, and/or nominees were given absolute and ungoverned discretion as attorney in fact for the depositor to carry on trading activities with the moneys and securities deposited, either separately or as part of a fund created by similar deposits, it being expressly provided that such funds were to "be employed in buying, selling, exchanging, trading in, or otherwise dealing in and with, either out-right or upon margin, stocks, bonds * * *, either upon short or long account or otherwise," and that such transactions might be effected directly through any broker, bank, or any member of a stock exchange. The hypothecation agreement provided that the funds and securities deposited by the customer should be held as security for the performance of all obligations arising in connection with the customer's account, with full authority given, from time to time and without demand or notice, to pledge or repledge all or any of the securities, separately or together with others, either for the amount due by the customer or a greater sum, and at such interest rates as the corporation might approve, and in express language provided that the corporation might "loan, borrow, deliver, and otherwise dispose of the securities separately or with others."

The corporation carried on its dealings with brokers and with banks in its own name, in the name of Bradley, its president, and of Hearn, its treasurer. In 1933 by proper resolutions it placed its assets under Bradley's control and at his disposal and gave him absolute authority, at his discretion, to trade and deal with said securities and to pledge and borrow money thereon as he saw fit. He in turn wrote and signed a letter, and placed it in the hands of the corporation, reciting in effect that all accounts carried in his name were for and in behalf of the corporation and were the corporation's property.

In the early part of December, 1933, Livingston & Co., brokers, through whom the corporation had been trading on the exchanges, was carrying for the corporation, against the trading account in its name, a debit balance in the amount of $20,670.01, and against the trading account in the name of Bradley, a debit balance in the amount of $25,305.74. On January 9, 1934, the debit balance against the trading account carried in the name of Hearn was in the sum of $40,700.17. To secure these various trading accounts, Livingston & Co. held securities in "street names,"[2] transferred by

---

[1] Under both the new and the old rules the recognized principle in the Federal courts for dealing with the master's findings of fact which are in the nature of conclusions or inferences is that no such finding will be given any great weight since the court is in as good a position to make or draw them as the master. Rule 53(e) (2), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Stewart v. Ganey, 5 Cir., 116 F.2d 1010; Budd Manufacturing Co. v. C. R. Wilson Body Co., 6 Cir., 21 F. 2d 803, 804; Kycoga Land Co., Inc., v. Kentucky Coal Corp., 6 Cir., 100 F.2d 894, 896. Where the facts are not in dispute, inferences and conclusions drawn by the trial court are not binding on the appellate court, which remains free to draw inferences and conclusions which in its opinion the findings reasonably induce. Rule 52(a), Federal Rules of Civil Procedure; Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 119 F. 2d 704; Adams County v. Northern Pac. R. Co., 9 Cir., 115 F.2d 768, 779; Carter Oil v. McQuigg, 7 Cir., 112 F.2d 275, 279.

[2] Securities held in "street names" means securities listed on the New York Stock Exchange, held in the name of brokers having seats on that Exchange, and properly endorsed for transfer in blank, generally accepted as transferable like currency.

the corporation and in which it had considerable equity.

Livingston & Co. maintained a local office in Atlanta through which it did business with the bank. The superintendent of this office introduced Bradley to Mr. Clay, the president of the bank, in the spring or summer of 1933, stating to him that Bradley was a shrewd trader who handled his accounts well. Bradley shortly thereafter opened an account with the bank. In the late fall of 1933, Bradley decided to close out the Livingston & Co. accounts, and approached Clay for a loan. On December 21, 1933, the bank made a loan to Bradley for account of the corporation in the sum of $55,000, $45,975.75 of which was paid over to Livingston & Co. by the bank in settlement of the trading accounts carried in the corporation's name and in Bradley's name, and Livingston & Co. surrendered to the bank the listed securities it held. On January 9, 1934, the bank made a second loan to Bradley for account of the corporation in the sum of $40,000, and said amount, together with other funds deposited by the corporation, was used by the corporation to pay the balance due Livingston & Co. by the corporation against the account carried in the name of Hearn, in the sum of $40,700.17. Thereupon Livingston & Co. surrendered to the bank the listed securities it held to secure the Hearn account. These securities, issued in "street names," were placed as collateral behind the two loans made by the bank to Bradley for account of the corporation. On January 25, 1934, the bank made a third loan to Bradley for account of the corporation in the sum of $8,000, and on April 24, 1934, it made a fourth loan in the sum of $5,-255.62, receiving from Bradley, as collateral, corporation securities in "street names." The proceeds of both loans were used in paying secured obligations of the corporation. On May 19, 1934, a fifth loan in the sum of $9,357.60 was made to Bradley for account of the corporation, and on June 1, 1934, a sixth loan in the sum of $2,684.50 was made. Securities of the corporation in "street names" were delivered by Bradley to the bank to secure these loans.

Under Section 70, sub. e, of the Bankruptcy Act, the right is given to a trustee in bankruptcy to proceed in the Federal District Court to avoid transfers made by the bankrupt which any creditor might have avoided under State law. Under the Georgia Code of 1933, Section 28-201, it is provided:

"The following acts by debtors shall be fraudulent in law against creditors and others, and as to them null and void, viz: * * *

"2. Every conveyance of real or personal estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description, had or made with intention to delay or defraud creditors, and such intention known to the party taking. A bona fide transaction on a valuable consideration, and without notice or ground for reasonable suspicion, shall be valid."

The bankrupt, unknown to the bank, was insolvent at all times during the transactions with the bank. During that time the bank, through its officers, knew the bankrupt was engaged in the business of trading in the markets, the source of its funds, and something of the distribution of its alleged earnings. It had knowledge of the bankrupt's method of trading and of handling its securities and bank accounts in its name, in Bradley's name, and in Hearn's name. It had in its credit files various reports; one, from a retail credit company, was especially complimentary to Bradley and to his company; another from Irving Trust Company advised caution in dealing with Bradley, as he had been subject to criticism; still another from Dun & Bradstreet stated that the bankrupt met its obligations promptly, that Bradley was worth a few thousand dollars, and that the bankrupt refused to make a financial statement. In addition to its files revealing that the bankrupt paid all bills promptly, the bank knew the bankrupt maintained an account with another bank and brokerage accounts with brokers in its name and in Bradley's name and enjoyed the confidence of these institutions. It also knew that many people, regarding Bradley as a financial genius, deposited their money and securities with his corporation with full authority to speculate therewith, and not one to its knowledge had complained. The bank had no notice of any fraudulent purpose on the part of the bankrupt unless trading in the stock market be so considered; it had no knowledge of any frauds perpetrated by the bankrupt or by Bradley.

The trustee, however, relies upon the Georgia law which provides that for the transactions between the bank and the

bankrupt to be bona fide they must have been made without notice or ground for reasonable suspicion of an intent to delay or defraud creditors on the part of the bankrupt. He points to a letter written by Bradley to the president of the bank under date of September 8, 1933, in which Bradley claimed that the earnings of his trading syndicate during the months of 1933 through August had shown an average net profit of 12.30½ per cent; and a letter to the bank written by Irving Trust Company under date of December 28, 1933, stating that it had been "informed that past activities of Mr. B. have come under criticism on numerous occasions." It is argued that these letters were sufficient to create reasonable suspicion of the bankrupt's intent and of Bradley's activities; hence, the transfers made to the bank by the bankrupt to secure and repay the loans were, as to creditors, fraudulent in law and void. The same contention is made with reference to the fact that the first loan made by the bank was sharply criticized by the bank's finance committee, and was by that committee pronounced hazardous; that following the making of the second loan the finance committee again voiced criticism for the same reason; and likewise following the third loan.

It is true that Bradley in a letter dated September 8, 1933, made claims to extravagant profits covering his dealings in the market over the months from January through August of that year. The bank officials admitted frankly that they suspected these claims to be exaggerated, but they testified that no one ever suspected or suggested that Bradley was engaged in fraudulent activities or that the transfers were made for the purpose of defrauding creditors. The bank made a rather thorough investigation which resulted in no information constituting a ground for suspicion. The bankrupt's main place of business was in Atlanta; it had hundreds of depositors, and at and during the time loans were made by the bank all depositors seemed satisfied; no complaints against Bradley or the bankrupt appear from the record; and Bradley, according to the record, enjoyed the general confidence of the community. Under these favorable circumstances it was natural for the bank to look upon his claim of earnings, though exaggerated, as evidencing that the business carried on by him was prospering. It is common practice for a seller to exaggerate the value of his wares, and extravagant claims for a commodity or for a service offered to the public for sale occur daily through the press and over the radio; almost all who read and hear them know them to be exaggerated, but few, if any, associate the exaggeration with fraud.

The confidential letter from Irving Trust Company stating that "we have been informed that the past activities of Mr. B. have come under criticism on numerous occasions," does not point to anything in connection with Bradley's business affairs that was culpable or fraudulent. No activity of Bradley indicative of such fact is mentioned, and this omission suggests lack of knowledge by the Trust Company of any particular fraudulent transaction. Mere criticism standing alone does not furnish ground for reasonable suspicion that the activities of one otherwise enjoying a good reputation in his community are questionable or that his dealings are fraudulent. There was no suggestion from any source that Bradley's corporation was in trouble financially or that it was losing large sums of money; on the contrary, commercial reports showed that its obligations were promptly met. The absence of complaint from depositors and payment of bills at maturity suggested successful operations, not fraudulent ones, and instead of furnishing ground for reasonable suspicion were, we think, of a nature to instill confidence.

The master found with reference to the criticism of the finance committee that it was based on the belief of the members that:

(a) Bradley's business was dangerous;

(b) It was very probable that he would lose the customers' money;

(c) When he lost the customers' money, they might raise a disturbance;

(d) The bank might be blamed for dealing with Bradley;

(e) The only advantage to the bank was on the interest made on the loans.

We think that the reasons advanced by the finance committee do not indicate that its members entertained a suspicion that the business carried on by Bradley was fraudulent. That his business was dangerous and that he would very likely lose the customers' money was evident. Anyone who speculates in the stock market is engaged in a business in which the risk of loss is great. That his customers would likely

raise a disturbance if they suffered a loss and the bank might be blamed for dealing with him, merely stated the finance committee's knowledge of human nature, namely, that a loser as a general rule complains and invariably seeks to place the blame elsewhere. The most, therefore, that can be said of the criticism by the finance committee is that its members considered the business in which Bradley was engaged as hazardous and likely to result in loss and criticism; hence, the bank had best have no dealings with him as a matter of policy. There is nothing in this attitude to suggest ground for reasonable suspicion of any fraudulent dealing by Bradley or Bradley's corporation; and that the committee had no such suspicion is made clear by the chairman and secretary thereof who testified that no member had ever suggested that Bradley was engaged in fraudulent activities.

We agree with the court below that the transfers of securities to secure the first four loans made by the bank to Bradley were made in good faith, and were made without notice or ground for reasonable suspicion of fraudulent intent to delay or defraud creditors. We do not agree with the court below that the bank had constructive knowledge of fraudulent intent as to the transfer of securities in connection with the fifth and sixth loans. So far as the record shows, the bank came into the possession of no new fact or report prior to the making of these loans. It made said loans on the same basis and with the same information it had when it made the second, third, and fourth loans. The sole difference between the first four loans and the last two was that the proceeds of the first four loans were mainly used to pay secured obligations of the bankrupt, while the proceeds of the last two loans were used by the bankrupt apparently in the conduct of its affairs, that is, trading on the open market.

Bradley was authorized both by the corporation and by contracts between the corporation and its depositors to handle all moneys and securities deposited with the corporation or acquired by the corporation in its trading transactions. These securities were delivered by Bradley as collateral for loans made in his name for the account of the corporation, and were returned to him when the loans were repaid months before the bankruptcy proceedings were filed. We see no force in the contention that the return of the securities to Bradley when the loans were repaid was improper and invalid. Having received the securities from Bradley, the status quo existing before the loans was restored when the securities were returned to Bradley.[3] Under the facts of the case we think that the defendant in the lower court, cross-appellant here, was entitled to a decree in its favor.

The judgment against the bank from which it cross-appealed is reversed; the judgment against the Trustee from which he appealed is affirmed.

[3] Glenn, Fraudulent Conveyances, p. 89: "The idea can be put by saying that these statutes, in ultimate effect, deal with the property itself or its equivalent in the hands of the debtor's grantee, or the transferees of the latter. If that be true, it would follow logically that a return of the property intact by any one of these transferees to the debtor prior to the institution of the creditor's attack would not merely relieve the situation practically speaking, but would discharge the transferee from further responsibility. In such a case the transferee, in ultimate effect, has served merely as a custodian for the debtor, and not to the creditor's harm at that." See also McLaughlin, Application of the Uniform Fraudulent Conveyances Act, 46 Harvard Law Review, 404, 435; Greason v. Holcomb, 131 App.Div. 868, 116 N.Y.S. 336, affirmed 196 N.Y. 571, 90 N.E. 1159; Cartledge v. McCoy, 98 Ga. 560, 563, 25 S.E. 588.