A. C. BURTON & COMPANY, A DISSOLVED CORPORATION, ACTING BY AND THROUGH BEATRICE BURTON, A FEME SOLE, GEORGE E. AYERS, AND B. M. TEMPLE, PRESIDENT, VICE PRESIDENT AND TREASURER, AND SECRETARY, RESPECTIVELY, AND DIRECTORS OF SAID CORPORATION AT THE TIME OF ITS DISSOLUTION, THE SAID BEATRICE BURTON, GEORGE E. AYERS, AND B. M. TEMPLE AS TRUSTEES OF THE SAID A. C. BURTON & COMPANY AND THE SAID BEATRICE BURTON AS TRANSFEREE OF THE ASSETS OF SAID CORPORATION, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 17168. Promulgated February 28, 1950.

*John C. Dawson, Esq.*, for the petitioners.
*Stanley B. Anderson, Esq.*, for the respondent.

### OPINION.

TURNER, *Judge*: The respondent determined deficiencies of $4,546.17 and $17,061.12 in the excess profits tax of A. C. Burton & Co. for 1942 and 1943, respectively. The single issue presented is the correctness of respondent's action in determining its excess profits tax credit on the invested capital basis.

The facts have been stipulated.

A. C. Burton & Co., sometimes herein referred to as the corporation, was a Texas corporation, had its principal place of business in Houston and filed its returns for 1942 and 1943 with the collector of internal revenue for the first district of Texas.

For 10 years or more prior to June, 1940, A. C. Burton had owned and operated a sole proprietorship business under the name of A. C. Burton & Co. in Houston. The business conducted under that name consisted of dealing in new and used automobiles, operating a repair shop, and the handling of installment paper acquired in connection with sales of automobiles.

On June 4, 1940, A. C. Burton and two employees of the sole proprietorship, Roy D. Henderson and George E. Ayers, as incorporators, executed an application for a charter for a corporation to be known as A. C. Burton & Co., with a capital stock of $100,000, consisting of 1,000 shares of a par value of $100 each, with Burton subscribing for 900 shares and Henderson and Ayers subscribing for 50 shares each. The purpose of the corporation was "To establish and maintain garages with authority to purchase, sell, store, house, rent, operate. repair and otherwise deal in automobiles and other motor vehicles and their accessories, gasoline, and oils necessary to the operation of motor vehicles. The right to operate shall not conflict with any ordinance of any incorporated city or town in which they shall operate." The application was accompanied by an affidavit of the incorporators showing that they had subscribed for the entire capital

stock and had paid for one-half thereof in cash. The application was approved and filed by the Secretary of State of the State of Texas on June 20, 1940.

On the day the application for the charter was executed, June 4, 1940, Burton caused the Burton Finance Co., a corporation owned by him, to issue to him its check for $50,000, which amount was entered on the books of that company as a loan to Burton. Thereupon on the same day Burton endorsed the check, opened an account with the First National Bank in Houston in the name of "A. C. Burton & Company, Inc.," and deposited the check to the credit of that account.

On June 24, 1940, the first meeting of the stockholders of the corporation and the first meeting of its directors were held. At the meeting of the directors Burton was elected president and his salary fixed at $750 a month. The First National Bank in Houston was named depository for the corporation, the officers of the corporation authorized to sign checks were designated and the bank was informed accordingly.

On June 24, 1940, the $50,000 deposited to the credit of the corporation by Burton on June 4, 1940, was applied in payment for $50,000 of the corporation's capital stock, after which the stock payment record of the corporation showed that the subscriptions of the incorporators had been paid to the extent of one-half thereof. On the same day certificates for 500 shares (one-half) of the corporation's authorized stock were issued as follows: Burton, 450 shares; Henderson, 25 shares; and Ayers, 25 shares. The stock issued to Henderson and Ayers, having been paid for by Burton, was owned by him but was issued in their names as his nominees.

On June 25, 1940, Burton caused the corporation to issue to him a check for $49,000 on its above mentioned account with the First National Bank of Houston. He thereupon applied it on an indebtedness owing to that bank by Burton Realty Co., the payment of which he had guaranteed. From June 25 until July 1, 1940, when the proprietorship's assets were transferred to the corporation, the corporation's assets consisted of $1,000 in cash and an account receivable of $49,000 owing by Burton to the corporation on account of the foregoing withdrawal of cash. While no entry was made on the corporation's books on June 25, 1940, respecting Burton's cash withdrawal on that day, the amount of the withdrawal was entered on the corporation's books on July 1, 1940, as a debit to his personal drawing account, which was set up at that time on the corporation's books.

The books of the proprietorship were closed as of Saturday, June 29, 1940. As shown by the stipulation of facts, the assets and liabilities of the proprietorship at the close of June 29, 1940, were as follows:

ASSETS

| | |
|---|---|
| Cash on hand and in the bank | $53,100.04 |
| Other current assets | 243,429.12 |
| Miscellaneous | 3,480.78 |
| Fixed assets, less depreciation | 15,213.80 |
| Deferred charges | 1,150.48 |
| Total | 316,374.22 |

LIABILITIES

| | |
|---|---|
| Notes and accounts payable | $155,235.61 |
| Accrued expenses | 577.52 |
| Reserve for repossessions | 8,028.14 |
| Accrued taxes | 2,748.30 |
| Burton Realty Co | 8,205.78 |
| A. C. Burton, drawing account | 50,408.87 |
| A. C. Burton, capital | 91,170.00 |
| Total | 316,374.22 |

On June 29, 1940, Burton caused the proprietorship to execute two checks to him on its bank accounts, one for $50,000 and one for $5,582.88. The two checks completely closed out the proprietorship's bank accounts. The difference between the total of the checks, $55,-582.88, and the amount of $53,100.04 shown in the above statement as cash on hand and in bank was due to the fact that certain checks theretofore issued by the proprietorship had not cleared on June 29, 1940.

Burton endorsed the two checks to the order of the corporation and on Monday, July 1, 1940, they were deposited in the corporation's bank account. Concurrently with the foregoing transaction, but without the execution of any instruments of conveyance or the adoption of any corporate resolution in connection therewith, the remaining assets of the proprietorship and all of its liabilities, except accrued taxes of $2,748.30 and the indebtedness to Burton Realty Co. of $8,205.78 for unpaid rental, were transferred from the proprietorship to the corporation.

On July 1, 1940, entries were made in the books of the corporation recording its acquisition of the assets of the proprietorship, including the $55,582.88 represented by the above mentioned two checks, together with the liabilities, except the accrued taxes and the indebtedness to Burton Realty Co. After offsetting against the amount of net assets the $49,000 of indebtedness owing by Burton to the corporation on account of the withdrawal of that amount on June 25, 1940, and the $50,000 of unpaid stock subscriptions of Burton, Henderson,

and Ayers, the remaining net assets in the amount of $53,532.95 were shown on the books of the corporation as a credit to Burton's personal drawing account. This represented an increase of $3,124.08 over the amount of his drawing account on the books of the sole proprietorship and represented in part the above proprietorship liabilities of $2,748.30 and $8,205.78 which had been satisfied or eliminated in some manner and had not been assumed by the corporation.

Payment having been made in that manner of the unpaid portion of the stock subscriptions of Burton, Henderson, and Ayers, the corporation issued to them certificates for shares of its stock as follows: Burton, 450 shares; Henderson, 25 shares; and Ayers, 25 shares. Thereupon Henderson transferred to Beatrice Burton 49 of the total of 50 shares which had been issued to him and Ayers transferred to her 25 of the total of 50 shares which had been issued to him, thus resulting in the corporation's 1,000 shares of outstanding stock being held as follows: Burton, 900 shares; Beatrice Burton, 74 shares; Ayers, 25 shares; and Henderson, 1 share. All of the stock so held was owned by Burton, and no further stock transfers were made until after his death in 1942.

After the consummation and recording of the above transactions the books of the corporation disclosed assets and liabilities as follows:

### ASSETS

| | | |
|---|---:|---:|
| First National Bank | $112,165.76 | |
| Less outstanding checks | 59,065.72 | $53,100.04 |
| Cash on hand and in bank | | 1,000.00 |
| Other current assets | | 243,429.12 |
| Miscellaneous | | 3,480.78 |
| Fixed assets | | 15,213.80 |
| Deferred charges | | 1,150.48 |
| Total assets | | 317,374.22 |

### LIABILITIES AND CAPITAL

| | |
|---|---:|
| Notes and accounts payable | $155,235.61 |
| Accrued expenses | 577.52 |
| Reserve for repossessions | 8,028.14 |
| A. C. Burton—drawing account | 53,532.95 |
| Capital Stock—authorized and outstanding | 100,000.00 |
| Total | 317,374.22 |

The corporation continued to conduct the same type of business as the proprietorship had been conducting. The books that had been used by the proprietorship were continued in use by the corporation. The corporation operated in the same building, with the same operating assets, the same employees and in the same name as the proprietorship had operated.

295

The net income of the proprietorship for the years 1936 through 1939 before adjustment of $750 per month, which would have been a reasonable salary to Burton during those years, was as follows:

| 1936 | $64,129.39 |
|------|-----------|
| 1937 | 49,205.17 |
| 1938 (loss) | 21,570.39 |
| 1939 | 7,909.32 |

The proprietorship during the period January 1, 1935, to June 30, 1940, and the corporation during the following period to the end of 1942, retained some of the installment notes received from the sale of automobiles and disposed of others to the First National Bank in Houston or to finance companies. During 1936 those received from the sale of new cars were sold and those from the sale of used cars were retained. During the first half of 1937 all notes received from the sale of used cars and some of the notes from the sale of new cars were sold or discounted. During the last half of that year some of the used car notes were discounted. All notes received from February 1, 1938, to August of that year were discounted. On October 14, 1938, Burton obtained a charter for a corporation known as Burton Finance Co. with a capital of $100,000. During November and December of 1938 the proprietorship sold most of the notes held by it to Burton Finance Co. Most of the notes received in connection with sales made in 1939 and in 1940 to June 30 of that year were discounted to the Burton Finance Co. As of June 30, 1940, the proprietorship increased its purchase note holdings from the amount then on hand of $9,588.54 to $20,282.98, by purchasing from the Burton Finance Co. notes in the principal amount of $10,694.44, representing all the finance paper held by that company at that time. These holdings totaling $20,282.98 were transferred by the proprietorship to the corporation in the transfer heretofore mentioned. Most of the notes received by the corporation from sales made by it from July 1 to October, 1940, were discounted to parties other than Burton Finance Co. Most of the notes held by the corporation during the period from October 31, 1940, to the end of the year were sold to Burton Finance Co. Most of the notes received during 1941 were sold to Burton Finance Co. and to other finance companies. Because of the war, car sales were greatly reduced in 1942. With the exception of approximately $1,600 of notes on hand at November 30 of that year, the notes received from the sales of cars to that date in 1942 were sold to Burton Finance Co. and to other finance companies. On December 1, 1942, the corporation acquired all notes then held by Burton Finance Co. totaling $35,047.29 in principal amount. So far as disclosed, the corporation disposed of no notes from the sale of cars in 1943.

The following is a statement of car sales, gross income from installment notes, and the amount of notes held at the end of the indi-

cated periods of the proprietorship to June 30, 1940, and of the corporation from July 1, 1940, to the end of 1943:

| Period | Car sales | Gross income from notes | Amount of notes at end of period |
|---|---|---|---|
| 1936 | $968,989.45 | $30,668.15 | $103,128.84 |
| 1937 | 1,138,727.96 | 15,954.92 | 90,193.49 |
| 1938 | 954,187.04 | 1,545.79 | 4,156.40 |
| 1939 | 935,813.25 | 2,559.82 | 4,423.64 |
| 1/1 to 6/30/40 | 459,500.51 | 3,331.02 | 9,588.54 |
| 7/1 to 12/31/40 | 429,906.76 | 2,176.15 | 4,851.10 |
| 1941 | 1,347,648.49 | 821.91 | |
| 1942 | 346,259.01 | 3,495.25 | |
| 1943 | 198,129.02 | 6,760.84 | |

Of the gross income of $30,668.15 received in 1936 by the proprietorship from notes, $20,417.70 constituted net income, and of the gross income of $15,954.92 received in 1937, $5,704.47 constituted net income.

In its returns for 1942 and 1943 the corporation computed its excess profits credits on the basis of the net income experience of the proprietorship for the years 1936 through 1939 and paid the taxes so computed. In determining the deficiencies in controversy the respondent determined that the corporation was not an acquiring corporation within the provisions of section 740 (a) (1) (D) of the Internal Revenue Code and that, since it was organized after January 1, 1940, its excess profits credit was, under the provisions of section 712, to be computed on the invested capital basis provided in section 714.

Section 712 (a) of the Internal Revenue Code provides with respect to domestic corporations which were in existence before January 1, 1940, that the excess profits credit is to be computed under section 713 (on the basis of income) or under section 714 (on the basis of invested capital), whichever results in the lesser tax, and that in the case of all other domestic corporations the excess profits credit is to be computed under section 714. By section 740 (f) a corporation which was not in existence before January 1, 1940, is, for the purposes of section 712 (a), to be considered to have been in existence before that date if it acquired the properties of another which was in existence before January 1, 1940. By section 740 (a) an "acquiring corporation" is defined as:

(1) A corporation which has acquired—

\* \* \* \* \* \* \*

(D) substantially all the properties of a partnership in an exchange to which section 112 (b) (5), or so much of section 112 (c) or (e) as refers to section 112 (b) (5), \* \* \* is or was applicable.

Section 740 (h) provides that "For the purposes of section 740 (a) (1) (D), \* \* \* a business owned by a sole proprietorship shall be considered a partnership." Section 112 (b) (5) provides:

No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; * * *

Section 112 (c) (1) provides:

If an exchange would be within the provisions of subsection (b) * * * (5) if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph * * * to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

It is the claim of the petitioner that A. C. Burton & Co. was an "acquiring corporation" within the meaning of section 748 in that it acquired substantially all of the assets of the A. C. Burton & Co. proprietorship in the manner prescribed by section 740 (a) (1) (D) and that it is entitled under the provisions of section 712 (a) to base the computation of its excess profits credit on the income of the proprietorship for the base period years 1936 through 1939.

The respondent does not dispute the acquisition by A. C. Burton & Co. of the business of the proprietorship or that Burton acquired all of the A. C. Burton & Co. stock and as owner thereof was in complete control of the corporation. He does contend, however, that A. C. Burton & Co. did not acquire the assets of the business of the proprietorship in such a manner as to bring the transaction within the provisions of section 740 (a) (1) (D) and that petitioner is not, therefore, entitled to base the computation of its excess profits credit upon the income of the proprietorship for the base period years.

The statutory requirements are briefly stated, and, though by reason of cross references they appear complex, they are in truth readily understandable. Section 112 (b) has to do only with the recognition or nonrecognition of gain, and by section 112 (b) (5) it is provided that where property is exchanged "solely" for stock or securities of the corporation the gain therefrom is not recognized. By section 112 (c) it is provided that where the exchange would have been within 112 (b) (5) but for the fact that the exchange was not solely for stock of the acquiring corporation, as required by 112 (b) (5), but for other property as well, then the gain is recognizable, but only to the extent that the property received was outside of 112 (b) (5). In making provision that an "acquiring corporation" might use the base period net income of its predecessor in computing its excess profits credit, Congress in section 740 (a) (1) (D) decided to include as an "acquiring corporation" a corporation which had acquired its properties from a partnership in a 112 (b) (5) transaction and further provided that the term "partnership" therein included a sole proprietorship. Congress did not choose, however, to treat any corporation which had acquired just any part of the properties of a partnership or proprietor-

ship in a 112 (b) transaction as an acquiring corporation, but as a condition prescribed that "substantially all" of the properties of the partnership or sole proprietorship must have been acquired either under 112 (b) (5) alone or under so much of 112 (c) as referred to 112 (b) (5). Rather plainly, the only part of a 112 (c) exchange which refers to 112 (b) (5) is that part of the exchange where the properties were received for stock, the rest of the 112 (c) exchange being the part where the properties were received for other property and being also within the gain realizing provisions of sections 112 (a) and not within 112 (b) (5) at all. If, then, a corporation is to be an acquiring corporation within the meaning of section 740 (a) (1) (D), it must have acquired substantially all of the assets of the partnership or sole proprietorship in exchange for its stock. See in this connection *E. T. Renfro Drug Co.*, 11 T. C. 994.

There can be no dispute that as the transaction herein occurred or was carried out, it did not meet the literal requirements of section 740 (a) (1) (D). A. C. Burton & Co. did receive in some manner substantially all of the assets which had belonged to the sole proprietorship, but it did not, according to the record made at the time, receive "substantially all" of the sole proprietorship assets for stock in a 112 (b) (5) transaction or in that part of a 112 (c) exchange which is covered by 112 (b) (5). At the time of the acquisition the net assets of the sole proprietorship amounted to $102,124.08, and of that amount and according to the record made at the time, $49,000 was used not to acquire stock of A. C. Burton & Co., but for the satisfaction of Burton's personal indebtedness in that sum covering the prior borrowing by him from the new corporation. $50,000 was applied to cover the balance of his stock subscription and the remaining $3,124.08 was added to the comparatively substantial drawing account which stood in his favor on the books of the sole proprietorship and was among the liabilities assumed by the new corporation.

Invoking the principle that substance, not form, controls, it is the claim of the petitioner that the transactions occurring prior to July 1, when the sole proprietorship assets were transferred to it, were mere formalities to satisfy technical statutory requirements in effecting its organization as a corporation and are to be disregarded in determining the applicability of section 740 (a) (1) (D). The difficulty with that argument is found in the absence of facts sufficient to supply a basis therefor. So far as we are able to determine, the only factual basis which the argument has is that the entire properties of the corporation, with the exception of $1,000 of the $50,000 borrowed by Burton from his Burton Finance Co. and paid in for one-half of the stock in the new corporation, was composed entirely of assets which had originally been the assets of the sole proprietorship. On the other hand, all of the facts of record indicate the reality of the borrowing of $50,000 by

Burton from the Burton Finance Co. on June 4, its deposit to the credit of the new corporation, the application for the charter of which was executed the same day, the application of that sum on June 24 in full payment for one-half of the authorized stock, and an actual borrowing on July 25 of $49,000 and the subsequent use by Burton on July 1 of $49,000 of the net assets of the sole proprietorship in the satisfaction of his personal indebtedness to the new corporation. Nowhere is it shown that there was any preconceived plan that in the beginning the transactions were to be carried out in such a manner that the new corporation was to have received only the assets of the sole proprietorship in exchange for its stock, $1,000 in cash as described above being excepted. Neither are there any writings or resolutions, corporate or otherwise, to show that the deposit of the $50,000 cash by Burton on June 4 to the credit of the corporation then being organized and its subsequent application in payment for one-half of the authorized stock were intended to be mere formalities, lacking in substance, rather than what they appeared to be. On the other hand, we have a series of transactions beginning on June 4, 1940, and continuing over approximately a period of a month, all of which appear in the record as stipulated by the petitioner, and we are left entirely to these various transactions in the stipulated series of events to ascertain the objectives sought to be accomplished by Burton and means employed to that end.

The stipulation shows without qualification the borrowing of $50,000 in cash by Burton from the Burton Finance Co. on June 4 and its deposit in a separate bank account for the credit of the corporation then being organized, and the application for the charter which was executed on that same day and which was approved and filed by the Secretary of the State of Texas on June 20, 1940. We also have without qualification a stipulation that on June 24, 1940, the $50,000 previously placed on deposit in the name of the new corporation was entered as a payment of record for $50,000 of the corporate stock. We have further the issuance on June 25 of a check by the new corporation to Burton for $49,000 and the use by Burton of that money in satisfaction of a debt owing by another of his companies, the Burton Realty Co., to the bank, which debt had been guaranteed by Burton. We then have a stipulation stated in words as follows:

During the period between June 25, 1940, and until the proprietorship assets were acquired by it, the corporation's assets consisted of $50,000 as follows:
$1,000.00 in cash, and a
$49,000.00 Account Receivable owing by Mr. Burton.

Likewise, during the same period, Mr. Burton's position with the corporation was as follows:

He owned 500 shares (being all of the stock of the corporation then issued and outstanding), for which he had paid $50,000.00 in cash.

He owed the corporation $49,000.00 on account of his withdrawal of cash in that amount.

He owed the balance of the stock subscriptions for the remaining authorized but unissued 500 shares of stock; hence owed on such subscription $50,000.00 ($45,000.00 of the subscription made in his name and $5,000.00 thereof owing on the two subscriptions made by Ayers and Henderson as his nominees).

The only qualification which in any way bears upon the above facts is that the stipulation was made "without prejudice to the rights of the petitioners to urge that the various steps in the transaction should be disregarded. There is in no respect any qualification that the facts so stipulated were not true and correct facts.

In the light of the above facts, we think there is no just basis for concluding in this case that the $49,000 indebtedness as shown on the books of the new corporation against Burton was not real or that it was without substance. Neither do we find any basis for concluding, as the petitioner would have us to do, that there was no substance to the transaction whereby the $50,000 deposited by Burton to the credit of the corporation then being organized on June 4 and its subsequent application in the payment for $50,000 of the authorized stock of the new corporation and that the $100,000 of stock of the new corporation, less $1,000, was actually issued in exchange for the assets of the sole proprietorship on July 1 rather than that $49,000 of those assets were paid into the new corporation by Burton in satisfaction of his individual indebtedness to the corporation in that amount and not in exchange for stock. Accordingly, it is our conclusion that the new corporation did not acquire substantially all of the properties of the sole proprietorship in an exchange meeting the statutory requirements of section 740 (a) (1) (D), and it is not, therefore, an acquiring corporation privileged to use the base period net income of the sole proprietorship for the purpose of computing its excess profits credit.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

JOHNSON, *J.*, dissenting: The majority's decision that petitioner was not an acquiring corporation is based on a recognition of the $50,000 deposited to petitioner's credit by Burton on June 4, 1940, as a bona fide payment for petitioner's shares. Petitioner had not been organized at that time, and the reason for the deposit was compliance with incorporation formalities. The very next day after the shares were issued, $49,000 was promptly withdrawn from the account, and petitioner was left with only $1,000 of nominal assets until July 1, 1940, when all the proprietorship's cash and assets were recorded on petitioner's books as transferred to petitioner.

The majority's view is well illustrated by the statement in the opinion:

\* \* \* Nowhere is it shown that there was any preconceived plan that in the beginning the transactions were to be carried out in such a manner that the new corporation was to have received only the assets of the sole proprietorship in exchange for its stock, $1,000 in cash as described above being excepted. \* \* \*

In my opinion the evidence is wholly incompatible with any other view. Burton's only intention was to incorporate his automobile business; all the assets of that business were transferred to petitioner, and all of petitioner's stock was issued to him or his nominees within a month after he filed application to organize a corporation to engage in the automobile business. To hold, as the majority does, that the $50,000 deposit, so soon withdrawn, was intended as a substantive payment for shares and that the asset transfer, following within a few days, was not part of a preconceived plan strains credulity. After organization, petitioner had the use of $49,000 of the $50,000 for only one day. It did no business with the money; it did not invest it in assets. Burton simply withdrew it, having fulfilled a perfunctory requirement of incorporation. I fail to see any substance in such act; substance inhered only in the asset-transfer, and in my view petitioner's shares were in reality issued for the assets.

ARUNDELL, J., agrees with this dissent.