**A. C. BURTON & CO. et al. v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 13437.**

United States Court of Appeals
Fifth Circuit.

June 30, 1951.

Sibley, Circuit Judge, dissented.

John C. Dawson, Houston, Tex., for petitioners.

Melva M. Graney, Ellis N. Slack, Special Assts. to the Atty. Gen., Theron L. Caudle, Asst. Atty. Gen., Charles Oliphant, Chief Counsel and Claude R. Marshall, Special Atty., Bureau of Internal Revenue, Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and SIBLEY and STRUM, Circuit Judges.

JOSEPH C. HUTCHESON, Chief Judge.

Involving excess profits taxes for the years 1942–1943, the single question, this appeal presents, is whether the taxpayer corporation, which in June, 1940, acquired substantially all of the properties of a sole proprietorship operated under the name of A. C. Burton & Co., was an "acquiring corporation", within the meaning of Sec. 740(a)(1)(D),[1] and thus was entitled to compute its excess profits credits by the income method.

The question arises in this way. In its returns for 1942 and 1943, the corporation computed its excess profits credits on the basis of the net income experience of the proprietorship for the years 1936 through 1939, and paid the taxes so computed. In determining the deficiencies in controversy, the commissioner determined that the corporation was not an "acquiring corporation" within the provisions of Sec. 740(a)(1)(D) of the Internal Revenue Code, 26 U.S.C.A. § 740(a)(1)(D), and the Tax Court, with two judges dissenting, affirmed the commissioner's determination.[2]

Because the stipulation on which the case was decided below appears fully in the majority opinion of the Tax Court, and be-

1. "A corporation which has acquired— * * * substantially all the properties of a partnership" [defined in section 740(h) as "including a business owned by a sole proprietorship"] "in an exchange to which section 112(b) (5), or so much of section 112(c) or (e) as refers to section 112(b) (5), or to which a corresponding provision of a prior revenue law, is or was applicable." I. R.C.

2. 14 T.C. 290.

cause the references to, and quotations from, the majority and minority opinions which follow will sufficiently point up the matter, and the reasons, for our decision, we will not here set out, or summarize, the facts. We will only say that the fact, which the majority regarded as crucial, and the minority as of no real significance, is that in proceeding to form the corporation, Burton took two steps instead of one.

Submitted to the Tax Court, as it was, on a stipulation, the case presented there, it presents here, for decision no controverted question of fact, but only a question of law or mixed question of law and fact, as to which this court is free to make its own decision.[3]

This is especially so here since the view of the majority of the Tax Court as to what was actually intended to be, and was, done by the taxpayer is, in our opinion, clearly erroneous.

The opinion of the minority[4] sets out with clarity and precision, not only the basic premise of the majority's decision, but the nature of its error. It is brief and to the point, and we are in entire agreement with it.

Quotations from, and a summary of the holding of the majority opinion will serve to show the dry bones character of the reasoning on which the decision rests, that it is legalistic, technical and literal, indeed a very sticking in the bark. The opinion frankly states: "The respondent does not dispute the acquisition by A. C. Burton & Co. of the business of the proprietorship or that Burton acquired all of the A. C. Burton & Co. stock and as owner thereof was in complete control of the corporation. He does contend, however, that A. C. Burton and Co. did not acquire the assets of the business of the proprietorship in such a manner as to bring the transaction within the provisions of Sec. 740(a)(1)(D)."

It then goes on to point out that in applying for a corporate charter for the company which was formed to, and did, take

---

3. 26 U.S.C.A. 1141(a); Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755; McManus' Estate v. Comm., 6 Cir., 172 F.2d 697; Harris Stanley Coal & Land Co. v. Chesapeake & Ohio Ry. Co., 6 Cir., 154 F.2d 450; Commissioner v. Fiske's Est., 7 Cir., 128 F.2d 487; Sheldon v. Waters, 5 Cir., 168 F.2d 483; Stubbs v. Fulton Nat'l. Bank, 5 Cir., 146 F.2d 558.

4. "The majority's decision that petitioner was not an acquiring corporation is based on a recognition of the $50,000 deposited to petitioner's credit by Burton on June 4, 1940, as a bona fide payment for petitioner's shares. Petitioner had not been organized at that time, and the reason for the deposit was compliance with incorporation formalities. The very next day after the shares were issued, $49,000 was promptly withdrawn from the account, and petitioner was left with only $1,000 of nominal assets until July 1, 1940, when all the proprietorship's cash and assets were recorded on petitioner's books as transferred to petitioner.

"The majority's view is well illustrated by the statement in the opinion: ' * * Nowhere is it shown that there was any preconceived plan that in the beginning the transactions were to be carried out

in such a manner that the new corporation was to have received only the assets of the sole proprietorship in exchange for its stock, $1,000 in cash as described above being excepted. * * '

"In my opinion the evidence is wholly incompatible with any other view. Burton's only intention was to incorporate his automobile business; all of the assets of that business were transferred to petitioner and all petitioner's stock was issued to him or his nominees within a month after he filed application to organize a corporation to engage in the automobile business. To hold, as the majority does, that the $50,000 deposit, so soon withdrawn, was intended as a substantive payment for shares and that the asset transfer, following within a few days, was not part of a preconceived plan strains credulity. After organization petitioner had the use of $49,000 of the $50,000 for only one day. It did no business with the money; it did not invest it in assets. Burton simply withdrew it, having fulfilled a prefunctory requirement of incorporation. I fail to see any substance in such act; substance inhered only in the asset-transfer and in my view petitioner's shares were in reality issued for the assets."

over the business of the proprietorship, Mr. Burton, instead of furnishing affidavits showing that the value of the property which the corporation had formed to be taken over was at least $100,000, and accompanying this by the usual affidavit of the incorporators showing that they had subscribed for the entire capital of $100,000 and had paid for it with the property, chose to comply with the statutory requirements for obtaining the charter by borrowing $50,000 and paying that into the company in cash as payment for half of the stock. So pointing, it concludes that when the assets were actually transferred to the corporation, as shown by journal entry dated July 1, made on the Corporation's books, they were transferred not for all but for half of the stock, one half of it having been acquired by the $50,000 paid in by Burton on June 4th, and withdrawn by him to the extent of $49,000 on June 25th.

After discussing the requirements of the code sections here involved, and stating that it is necessary for a 740(a)(1)(D) transaction that a corporation must acquire not just a part, but all, of the assets of the proprietorship in exchange for its stock, the majority, in an excess of legalism, then goes on to say:

"There can be no dispute that as the transaction herein occurred or was carried out, it did not meet the *literal requirements of sec. 740(a)(1)(D). A. C. Burton & Co. did receive in some manner substantially all of the assets which had belonged to the sole proprietorship but it did not, according to the record made at the time, receive 'substantially all' of the sole proprietorship assets for stock in a 112(b)(5) transaction or in that part of a 112(c) exchange which is covered by 112(b)(5).* (emphasis supplied)

"At the time of the acquisition the net assets of the sole proprietorship amounted to $102,124.08, and of that amount, and according to the record made at that time, $49,000 was used not to acquire stock of A. C. Burton & Co., but for the satisfaction of Burton's personal indebtedness in that sum covering the prior borrowing by him from the new corporation."

Proceeding then, in complete disregard of the actualities of the situation to present as a separated and independent transaction, the borrowing of the $50,000, which was in fact borrowed as an integral part of the formalities for obtaining the charter, the majority primly concludes: "Nowhere is it shown that there was any preconceived plan that in the beginning the transactions were to be carried out in such a manner that the new corporation was to have received only the assets of the sole proprietorship in exchange for its stock, $1000 in cash as described above being excepted. Neither are there any writings or resolutions, corporate or otherwise, to show that the deposit of the $50,000 cash by Burton on June 4th to the credit of the corporation then being organized and its subsequent application in payment for one-half of the authorized stock were intended to be mere formalities lacking in substance rather than what they appeared to be."

In Tennessee, A. & G. Ry. Co. v. Comm., 187 F.2d 826, 829, in affirming an opinion of the Tax Court, which, unlike the majority opinion here, had seen and given effect to the substance, the reality, of the facts as they were presented, the Court of Appeals for the Sixth Circuit quoted with approval from the opinion of the Tax Court:

"The evidence shows the chronology and details of the steps which were taken, but those facts do not prove that the various steps were not all a part of one plan. * *

"Transactions should be looked at as a whole and consideration given to substance rather than to form when the possible application of any of the non-recognition provisions of section 112(b) is in question. (Citing cases.)"

After quoting the above, the Court of Appeals went on to say:

"And without regard to whether the result is imposition (of) or relief from taxation, the courts have recognized that where the essential nature of a transaction is the acquisition of property, it will be viewed as a whole, and closely related steps will not be separated either at the instance

of the taxpayer or the taxing authority. * * *

"In Helvering v. New Haven & S. L. R. Co., Inc., 2 Cir., 121 F.2d 985, 988, it was held in relation to section 112(b)(5) of the Internal Revenue Act [26 U.S.C.A. § 112 (b)(5)] that for income tax purposes a transaction cannot be separated into its several steps and the last step treated as though it stood alone. Judge Learned Hand said: 'As for the effort of the Commissioner to atomize the plan, as it were, i. e. to separate it into its several steps and treat the last as though it stood alone, it has been repeatedly repudiated.' (Citing cases.)"

In Howell Turpentine v. Commissioner, 5 Cir., 162 F.2d 319 and in Wurtsbaugh v. Commissioner, 5 Cir., 187 F.2d 975,[5] reaffirming that decision, this court has had recent occasion to decline to affirm decisions of the Tax Court based on an unrealistic approach like that exhibited here.

We are in no doubt, that in denying the petitioner the right to compute its excess profits credits by the income method, the decision of the majority was wrong, and that it must be reversed and the case remanded with directions for the computation of the excess profits credits based on income.

In view, however, of the alternative claim of the commissioner, that if the taxpayer is held to be an "acquiring corporation" and entitled to compute its excess profits credits by the income method, the case should be remanded to the Tax Court for the determination of issues bearing on such computation, it will be so ordered.

SIBLEY, Circuit Judge (dissenting).

The majority of the Tax Court judges say: "Neither are there any writings or resolutions, corporate or otherwise, to show that the deposit of $50,000 in cash by Burton on June 4 to the credit of the corporation then being organized, and its subsequent application in payment for one half of the authorized stock, were intended to be mere formalities lacking in substance, rather than what they appeared to be". The minority says: "To hold as the majority does that the $50,000 deposit so soon withdrawn was a substantive payment for shares and that the asset transfer following within a few days was not a part of a preconceived plan strains credulity. * * * I fail to see any substance in such act; substance inhered only in the asset transfer and in my view petitioners shares were in reality issued for the assets". The minority indeed calls the deposit "a perfunctory requirement of incorporation". I think the $50,000 put in bank on June 4, 1940, was as stated in the affidavit filed with the Secretary of State that day, a payment in cash for one half the capital stock on their subscription for the whole of it, and can be regarded as nothing else. The Texas corporation law under which the charter was offered to the Secretary for approval and filing contains these provisions: Rev. Civ.Stats., Art. 1308: "Before the charter of a private corporation created for profit can be filed with the Secretary of State, the full amount of its authorized capital stock must be in good faith subscribed by its stockholders and fifty per cent thereof paid in cash, or its equivalent in other property or labor done, the product of which shall be worth to the company the actual value at which it was taken or at which the property was received. The affidavit of those who executed the charter shall be furnished to the Secretary of State, showing:

"1. The name, residence and post office address of each subscriber to the capital stock of such company;

"2. The amount subscribed by each, and the amount paid by each;

"3. The cash value of any property received, giving its description, location and from whom and the price at which it was received * * *." Art. 1309: "If the

5. Seiberling Rubber Co. v. Comm., 6 Cir., 169 F.2d 595; Mather & Co. v. Comm., 3 Cir., 171 F.2d 864; Labrot v. Burnet, 61 App.D.C. 47, 57 F.2d 413; Louis W. Gunby v. Helvering, 74 App.D.C. 185, 122 F.2d 203; Kuldell v. Comm., 5 Cir., 97 F.2d 725; Snowden v. McCabe, 6 Cir., 111 F.2d 743.

Secretary of State is not satisfied, he may, at the expense of the incorporators, require other satisfactory evidence before the shall be required to receive, file and record such charter". Burton and his associates thus had a choice in transferring his former business to a corporation, either to pay for one half of the stock with property, or to pay cash for the stock and cause the corporation to buy the property later. The advantage in the latter course was that the business was a mass of assets and liabilities whose actual value to the corporation might be questioned by the Secretary. He could raise no question and make no delay if cash were used. Facts found by the court, based on stipulation, are: "The application was accompanied by an affidavit of the incorporators showing that they had subscribed for the entire capital stock and *had paid for one half thereof in cash.* The application was approved by the Secretary of State on June 20, 1940. * * * On June 24, 1940, the first meeting of the stockholders of the corporation and the first meeting of its directors was held. * * * On June 24, 1940, the $50,000 deposited to the credit of the corporation by Burton on June 4, 1940 *was applied in payment* for $50,000 of the corporation's capital stock after which the payment record of the corporation showed that the subscriptions of the incorporators *had been paid* to the extent of one half thereof. *On the same day* certificates for 500 shares (one half) of the corporation's authorized stock *were issued,* Burton 450 shares, Henderson 25 shares, and Ayers 25 shares. The stock issued to Henderson and Ayers having been *paid for* by Burton was *owned by him* but issued in their names as his nominees." (Emphasis added). The corporation therefore after its organization *accepted* the cash deposited in its name *in payment for 500 shares of stock,* which it duly issued and delivered and made full and appropriate entries on its records. One of the methods for obtaining a charter had been lawfully and deliberately followed. The payment of the $50,000 into the corporation was not a "perfunctory requirement of incorpora-

tion", but a very substantial part of it, on the faith of which the charter was approved. As to the 500 shares of stock thus paid for and delivered, there has never been any rescission, if any there could be.

On the following day Burton *borrowed* $49,000 from the company, which was entered on its books as a *loan,* and used by him to pay another debt elsewhere. The next week, on July 1, book entries were made showing receipt by the company of the assets, and assumption of the liabilities of Burton's automobile sales business, at a net value of $102,532. Of this credit $49,-000 was applied to the loan of that sum due by Burton; $50,000 was applied to the payment of the remainder of the stock subscription, and the remainder put to Burton's credit as a drawing account. By this transaction the corporation acquired on July 1 all the assets of Burton's former business, but did not pay therefor substantially all its capital stock, but only $50,000, or one half of it. This sort of acquisition of a precedent business does not come within the provisions of the subsequently enacted Excess Profits Act of 1940 in respect of the matter here involved. These provisions cannot be stretched to cover this case because Burton may have had a general intent all the time to sell his business and acquire the corporations stock. The Texas law gave him a choice of two methods of going about it, but he had to choose. He deliberately, clearly, and consistently chose to buy half the stock for cash, and after organization to get the other half by a sale of his assets to the corporation, in a settlement of the sale. The tax consequences afterwards arising must be visited, whether more or less favorable than if he had chosen otherwise.

The Tax Court's conclusion is supported as to what was actually done by the incorporators' affidavit filed with the Secretary of State, by the acceptance of the $50,000 in payment for stock, and actual issue of the stock, and by all the corporate records. There is no evidence otherwise. I would affirm the judgment.