PITTSBURGH . AND WEIRTON BUS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 35357.   Promulgated March 16, 1954.

*Robert P. Smith, Esq.*, for the petitioner.
*Lyman G. Friedman, Esq.*, for the respondent.

894

OPINION.

LeMire, *Judge:* Petitioner seeks relief from excess profits taxes for the years 1940 to 1945, inclusive, under section 722 (b) (4) and (5).

Since its organization in 1931, the petitioner has been engaged in operating buses for transporting passengers over routes between Weirton, West Virginia, and Steubenville, Ohio, and between Pittsburgh, Pennsylvania, and Steubenville, Ohio, by way of Weirton and other adjacent points in the general vicinity of Weirton, West Virginia.

Petitioner is entitled to compute its excess profits credit for the years in question based on its base period net income with the benefits afforded in section 713 (f) of the Code.

Petitioner's excess profits net income for 1939 is $54,991.88, which is the amount of its average base period net income computed under section 713 (f) for 1941 and subsequent years. For the year 1940 petitioner's average base period net income computed under section 713(f) is $44,489.25.

The petitioner contends that it is entitled to use a constructive average net income to compute its excess profits credit because it changed the character of its business during the base period years and that it was committed as of December 31, 1939, to a change in its capacity for operations, which plan was not consummated until after January 1, 1940. Invoking the push-back rule, the petitioner contends that by the end of its base period it did not reach the level of earnings it would have reached had the changes been made 2 years before, thus qualifying for relief under section 722 (b) (4).

The petitioner also claims that if it does not qualify for relief under section 722 (b) (4), then the same events and conditions qualify it for relief under subsection (b) (5).

The respondent argues that petitioner is not entitled to use a constructive average base period net income because of a change in character during the base period, since it has not shown that a fair and just amount representing normal earnings for the base period would be in excess of its average base period net income computed under the growth formula, and that petitioner was not committed to change in its capacity for production or operation prior to January 1, 1940.

The petitioner contends that it changed the character of its business during the base period because it eliminated all competition. The record shows that the Pennsylvania Railroad Company voluntarily discontinued operations in 1936, and that the Steubenville, Wellsburg and Weirton Railway Company voluntarily discontinued its operations in the area serviced by the petitioner in the latter part of 1938. The petitioner makes no contention that it acquired the franchise or equipment of these two carriers.

In February 1937 the petitioner acquired the franchise and equipment of the S. & W. Bus Company, and as of December 31, 1938, petitioner acquired, by purchase, the intrastate franchise rights of the Blue Ridge Bus Company. These acquisitions if of sufficient importance could represent a change in the character of its business in its base period within the intent of section 722 (b) (4). However, the establishment of a qualifying factor does not mean that the petitioner is automatically entitled to relief. It must be further demonstrated that its average base period net income is an inadequate standard of normal earnings because of such factor and must further show what would be a fair and just amount representing normal earnings. *Green Spring Dairy, Inc.*, 18 T. C. 217; *Powell Hackney Grocery Co.*, 17 T. C. 1484.

After the acquisition of the S. & W. Bus Company's franchise and equipment in February 1937, the petitioner had a period of approximately 23 months before the commencement of its last base period year in which to reach a normal level of operations after the change.   With respect to the acquisition of the intrastate franchise of the Blue Ridge Bus Company, the evidence does not show whether that company actually picked up and discharged intrastate passengers.   The petitioner has not shown whether there was an increase in passenger haul as a result of such changes, and it has not made any comparison of operating costs before and after the changes.

The petitioner has offered no evidence to show that its average base period net income is an inadequate standard of normal earnings and what would be a fair and just amount representing normal earnings because of the aforementioned qualifying factors consummated during its base period.   The secretary of the petitioner, Anthony Battaglia, testified that prior to January 1939, when the petitioner was in competition with the other carriers, it was hauling about 50 per cent of the passengers.   Since the petitioner's excess profits net income in 1939, without the benefit of section 722, both under the 1940 and 1941 to 1945 computations, was more than double that for the year 1938 it is doubtful whether the petitioner could have shown that the earning level of the business at the end of the base period was not as great as it would have been had the changes been made 2 years earlier.   We think it is apparent that petitioner was unable to show that a fair and just amount to represent normal earnings for use in determining constructive average base period net income would exceed its average base period net income as determined under the growth formula.

Therefore, we hold that the petitioner has failed to establish its right to relief under section 722 (b) (4) by reasons of changes in the character of its business during its base period.

The petitioner's contention that its average base period net income is an inadequate standard of normal earnings is based principally on the fact that it consummated a change in its capacity for production or operation during the taxable years ending after December 31, 1939, as the result of a course of action to which it was committed prior to January 1, 1940.   The change in character to which the petitioner claims to have been committed prior to January 1, 1940, is its establishment of new bus routes and improved service on old routes.   Since the changes took place after December 31, 1939, it is incumbent upon the petitioner to show that the changes were the result of a course of action to which it was committed prior to January 1, 1940.

In furtherance of its claim that it was committed to a course of action during the base period the petitioner contends that, since it had eliminated all competition and was the only company furnishing bus transportation, it was legally required to improve its service and to

provide service to the several communities surrounding the area it then served. It argues that during 1939 it received several petitions from residents requesting it to provide bus service in their localities; that the petitioner's president had orally promised to provide such service; that several surveys were made by an employee in which he made recommendations for improvements in existing routes and for the establishment of new routes; and, furthermore, that petitioner had obligated itself to purchase additional buses to provide such service.

The record discloses that in order to establish new routes it was necessary for the petitioner to first make application to the Public Service Commission of West Virginia for certificates of convenience and for authority to provide such service. Two applications for such authority were filed on May 1, 1940, a third application was filed on November 14, 1940, and a fourth application on April 17, 1941. Petitioner advanced no reason for the delay in filing its applications for certificates of convenience after the surveys had been completed. The long lapse between the completion of the surveys and the filing of the applications for authority to establish the new routes indicates that the petitioner had not definitely decided to furnish the requested additional services. The evidence clearly shows that the oral promises made to those citizens were indefinite and in no wise committed the petitioner to provide such service. The petitioner's president, Mike Starvaggi, in this connection testified as follows:

> Q. How did you obligate yourself or your company to furnish that additional service in 1939?
>
> A. I obligated myself with the people who came in to me and I told them just to give us a little time, that you would get this thing to working the way it belonged and we were going to give you the service.

The evidence that petitioner obligated itself in 1939 to purchase additional equipment to provide the new service inaugurated subsequent to the base period is contradictory and not persuasive. Starvaggi testified that late in 1939 he had signed orders for the purchase of 15 new buses, 4 of which were delivered in December 1939 and the remainder in 1940 and 1941. The stipulated facts show that during the period from March through December 1939 the petitioner owned and operated only 20 buses. Obviously, if 4 new buses were purchased by and delivered to petitioner in December. 1939, they were used to replace old buses that were retired from service. The record further shows that the number of persons employed in the month of December 1939 was 40, the same number as in October.

The rule is well established that while a legally binding form of commitment is not required it should be proved by a change in posi- tion, unequivocally establishing the intent to make the change within a reasonably definite period of time. The Treasury Department Bulletin on Section 722 (Nov. 1944) discusses other criteria that may be

given weight in determining whether or not there has been a commitment to a course of action prior to January 1, 1940, such as progress to a point where there could not be a withdrawal without substantial detriment. The petitioner argues that because of the promises made to the residents in the Weirton area to provide additional service it had progressed to a point in 1939 from which it could not withdraw without suffering substantial detriment, namely, a return to competitive conditions existing prior to 1939. The petitioner makes the point that the residents of the surrounding area desiring bus service could have petitioned the Public Service Commission to have such service established either by a directive issued to petitioner or by granting authority to other bus companies willing to provide the service. We think the mere threat of possible competition is too remote to establish the fact of a detriment. Petitioner in 1939 was the only bus company serving that area and it is unlikely that the Public Service Commission would have authorized competitive service unless the petitioner refused to supply the service if the necessity therefor was established.

Whether petitioner was committed to a course of action within the meaning of section 722 (b) (4) is a question of fact to be decided from the evidence which is to be interpreted in accordance with the prescribed regulations. *Lockhart Creamery*, 17 T. C. 1123. Under all of the evidence, we hold that petitioner has failed to show a commitment prior to January 1, 1940, within the meaning of section 722 (b) (4) of the Code.

Petitioner also claims relief under section 722 (b) (5). On brief, it argues that the peculiar competitive situation in the Weirton area existing in the early part of the base period constitutes a factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period.

The respondent contends that the claim for relief under the provisions of section 722 (b) (5) are not properly before the Court, and that the petitioner has not shown that the base period net income was adversely affected by other factors.

In its applications for relief (Form 991) for each of the years involved, the petitioner checked all subsections (b) (1), (2), (4), and (5) of section 722 and after each item inserted the words "see statement attached." The attached statement appended to each application sets forth allegations generally but does not specify which facts and allegations are applicable to each of the subsections of 722 (b).

The petition filed herein assigns error under section 722 generally. It sets forth certain facts and allegations and concludes that as a result of the events enumerated the petitioner is eligible for relief under section 722 (b) (4) or (5) of the Code. We think it doubtful

whether a claim for relief under section 722 (b) (5) is properly before the Court. Assuming, *arguendo*, that such a claim is presented, the petitioner has failed to establish any qualifying factors other than those claimed to qualify it under section 722 (b) (4). Hence, it is not necessary for us to consider the petitioner's eligibility for relief under section 722 (b) (5). *George Kemp Real Estate Co.*, 12 T. C. 943; *General Metalware Co.*, 17 T. C. 286; *Mitchell & Co.*, 20 T. C. 110.

Therefore, we hold that petitioner has failed to establish that it is entitled to any relief under section 722 of the Code.

The respondent requests us to determine that there is a deficiency in petitioner's excess profits tax liability for the taxable year 1944 in the amount of $29,454.95, arising from a deferment of excess tax under section 710 (a) (5) of the Code.

On March 27, 1951, the respondent mailed to the petitioner a notice under section 732 of the Code rejecting in full petitioner's applications for relief under section 722 for the years 1940 to 1945, inclusive. In the notice of disallowance the respondent advised the petitioner that its excess profits tax liability for 1944 was $59,802.46, which was petitioner's excess profits tax liability reduced by the payment deferred under section 710 (a) (5) and by appropriate credit under section 784.

In the petition filed herein the single assignment of error set forth alleges "(a) Respondent has erred in rejecting petitioner's application for relief under section 722 of the Code for each of the years 1940 to 1945, inclusive."

The petitioner makes three separate references in its petition to the fact that its excess profits tax liability for the year 1944 is in the amount of $89,257.41.

At the hearing of this proceeding the respondent moved for and was granted leave to file an amended answer praying that this Court find a deficiency in excess profits tax for the year 1944 in the amount of $29,454.95. The petitioner opposed the granting of the motion on the ground that it was a standard issue and the only assignment of error set forth in the petition is the disallowance of the claims for relief under section 722.

It appears that no notice of deficiency under section 272 (a) of the Code has been sent to the petitioner. In *California Vegetable Concentrates, Inc.*, 10 T. C. 1158, it was held that the reduction in tax allowed by section 710 (a) (5) is not a part of "the tax imposed" within the language of section 271 and it is improper to include the deferred amount in assessing a deficiency. The assertion of a deficiency in an amended answer is not the equivalent of the service of a statutory notice of deficiency.

The only issue properly before us is whether the petitioner is entitled to relief under section 722 of the Code. *Mutual Lumber Co.*, 16 T. C.

900

370; *Martin Weiner Corporation*, 21 T. C. 470; *West Flagler Amusement Co.*, 21 T. C. 486.

Reviewed by the Special Division as to the section 722 issue.

> *Decision will be entered that petitioner is not entitled to relief under section 722.*