DIXIE PORTLAND FLOUR COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 26148, 31343. Filed December 31, 1958.

*Llewellyn A. Luce, Esq.*, and *Albert B. Maloney, Esq.*, for the petitioner.

*S. A. Winborne, Esq.*, for the respondent.

TIETJENS, *Judge:* These consolidated proceedings involve claims for refund of excess profits taxes for the taxable years ended May 31, 1943 through 1946.

The issues for decision are: (1) Whether petitioner qualifies as an "acquiring corporation" within the meaning of section 740 (a) of the 1939 Code with respect to its acquisition of certain properties of the partnership Majestic Flour Mill, and with respect to its acquisition of the properties of the Eisenmayer Milling Company and the Arkansas City Flour Mills Company; if so, (2) whether it filed timely

claims for such relief for its taxable years 1943 through 1945; and (3) whether petitioner is entitled to excess profits tax relief under section 722 (b) (5) of the 1939 Code.

FINDINGS OF FACT.

The stipulated facts are so found, and are incorporated herein by this reference.

Dixie Portland Flour Company (hereinafter referred to as the petitioner), a Tennessee corporation with its principal place of business at Memphis, Tennessee, filed its excess profits tax returns for the years in issue with the collector of internal revenue for the district of Tennessee.

Petitioner kept its books and records and filed its Federal tax returns on the basis of a fiscal year ended June 30 for each of the years 1937 through 1939; and on the basis of a fiscal year ended May 31 for each of the years 1940 through 1946.

On September 29, 1939, petitioner purchased 3,210 of the 3,350 outstanding shares of the stock of the Eisenmayer Milling Company (hereinafter referred to as Eisenmayer) from Eisenmayer's shareholders for a cash consideration of $433,350. On February 5, 1942, a portion of Eisenmayer's assets was sold to the Majestic Flour Mill for $112,000. In May 1942, Eisenmayer's assets were converted into cash, it was dissolved, and the cash was distributed among its shareholders in proportion to their stock ownership. In exchange for its Eisenmayer stock petitioner received the amount of $493,024.59.

On February 4, 1940, petitioner purchased all the stock of the Arkansas City Flour Mills (hereinafter referred to as Arkansas) from Arkansas' shareholders for $286,014.97 cash. On July 31, 1942, Arkansas was dissolved and its assets, having a net book value of $404,285.36, were transferred to petitioner in exchange for its stock then held by petitioner.

The Majestic Flour Mill (hereinafter referred to as Majestic) was a partnership organized under the laws of Tennessee. Its partners, their respective interests in Majestic, and the number of shares of petitioner's outstanding 1,000 shares of common stock owned by them during the years in issue as set forth below:

| Name | Partnership interest | Number of shares of petitioner's stock | | |
| --- | --- | --- | --- | --- |
| | | 1942 | 1943 | 1944–46 |
| | *Per cent* | | | |
| C. B. Stout | 12½ | 947 | 869 | 845 |
| Warda Stout | 37½ | 14 | 18 | 21 |
| Alice Stout Edwards | 37½ | 11 | 15 | 18 |
| Charlotte Stout Hooker | 12½ | | 45 | 48 |

Majestic kept its books and records and filed its Federal tax returns on the basis of a fiscal year ended June 30 for the years 1937 through 1939, and on the basis of a fiscal year ended May 31 for the years 1940 through 1946.

On May 29, 1942, Majestic's partners and petitioner entered into an agreement whereby Majestic agreed to sell petitioner all its current assets and further agreed to lease to petitioner certain of its fixed assets for a specified term of years. On May 31, 1942, pursuant to that agreement, Majestic transferred to petitioner all its current assets valued as set forth below:

| | |
|---|---:|
| Cash | $17, 656. 01 |
| Accounts receivable | 112, 853. 99 |
| Inventories | 257, 937. 51 |
| Defense bonds and stamps | 16. 30 |
| Expense funds | 3, 093. 65 |
| Total | 391, 557. 46 |

In consideration for that transfer, petitioner assumed Majestic's liabilities in the amount of $124,075.04, and issued to Majestic its 10-year debenture note in the amount of $267,482.42, bearing interest at 6 per cent per annum.

In addition to the assets transferred by it to petitioner, Majestic, as of May 31, 1942, owned the following fixed assets having a depreciated book value of $166,622.75:

| | | |
|---|---:|---:|
| Land | | $7, 079. 23 |
| Buildings | $130, 788. 10 | |
| Machinery and equipment | 56, 685. 36 | |
| Office equipment | 1, 219. 49 | |
| Automobiles and trucks | 97. 40 | |
| Total | 188, 790. 35 | |
| Less: Depreciation reserve | 29, 246. 83 | |
| Total depreciable property | | 159, 543. 52 |
| Total assets | | 166, 622. 75 |

In furtherance of their agreement of May 29, 1942, Majestic leased to petitioner all its machinery, furniture, fixtures, tools, equipment, brands, trademarks, trade names, and goodwill for a 10-year term commencing June 1, 1942, for an annual rental of $6,000. Petitioner also was given the right to lease Majestic's premises as a sublessee for the term commencing July 8, 1942, through July 8, 1947.

On July 8, 1942, an unspecified portion of the buildings, machinery, and equipment leased by petitioner from Majestic was sold by Majestic to the Union Equity Co-operative Exchange, Inc., for $60,000 cash. On July 14, 1942, the remaining land held by Majestic, and an additional part of the buildings, machinery, and equipment leased

from it by petitioner, were sold by Majestic to Anheuser-Busch, Inc., for $100,000 cash. During December 1942 and April 1943 petitioner purchased from Majestic certain machinery and equipment which it was then leasing, for $25,241.40 cash which was an amount equal to the cost basis of those assets. The rest of the buildings, machinery, and equipment which petitioner was leasing from Majestic, having a net book value of $3,718.09, was sold prior to November 1, 1944, by Majestic to parties not material hereto for $9,850 cash.

On October 1, 1942, Majestic transferred $100,000 to petitioner in exchange for petitioner's debenture note in like amount due June 1, 1952, bearing interest at the rate of 6 per cent per annum. On October 20, 1942, Majestic transferred $50,000 to petitioner in exchange for a similar note in the principal amount of $50,000. Majestic was dissolved on June 30, 1947.

Petitioner's excess profits credit based on invested capital for each of the years in issue was:

| Fiscal year ended May 31 | Invested capital credit |
| --- | --- |
| 1943 | $150, 290. 67 |
| 1944 | 165, 814. 65 |
| 1945 | 171, 739. 43 |
| 1946 | 183, 124. 88 |

Set forth below are the net earnings of the petitioner, Majestic, Arkansas, and Eisenmayer for the fiscal years as indicated:

| Fiscal year ended | Petitioner | Majestic [1] |
| --- | --- | --- |
| June 30, 1937 | $216, 808. 61 | $165, 446. 98 |
| June 30, 1938 | (88, 924. 06) | 63, 871. 28 |
| June 30, 1939 | 24, 016. 35 | 165, 775. 96 |
| May 31, 1940 | 97, 651. 11 | 92, 412. 23 |

| Fiscal year ended May 31 | Arkansas | Eisenmayer |
| --- | --- | --- |
| 1937 | $16, 279. 01 | $66, 308. 64 |
| 1938 | (54, 789. 18) | 6, 400. 35 |
| 1939 | (5, 213. 97) | 11, 698. 64 |
| 1940 | 26, 311. 36 | 3, 292. 76 |

[1] Majestic's earnings converted to a corporate basis would be subject to a deduction for State income and declared value excess-profits taxes in the amount of 4 per cent of the net earnings for each of the base period years, and a further deduction for officers' salaries.

Petitioner filed tentative and completed excess profits tax returns for the years in issue on the dates set forth below:

| Fiscal year ended May 31 | Tentative return filed | Completed return filed |
| --- | --- | --- |
| 1943 | Aug. 13, 1943 | Oct. 15, 1943 |
| 1944 | Aug. 14, 1944 | Sept. 6, 1944 |
| 1945 | | Aug. 18, 1945 |
| 1946 | | Aug. 15, 1946 |

Petitioner filed applications for excess profits tax relief under section 722 of the Code on Forms 991 for the taxable years in issue on September 7, 1944, December 6, 1945, and August 15, 1946. In each of those applications petitioner indicated it was claiming relief un-

der section 722 (b) (2), (b) (4), and (b) (5) of the Code. With reference to its claims under section 722 (b) (5) it made the following comment: "See General Comments and Schedule A. Items 6-7 & 8." Those "General Comments" were contained in data attached to its application for the year ended May 31, 1943, and were incorporated in each of the other applications by specific reference. Set forth below is an extract from those "General Comments":

The taxpayer contends it should be allowed the benefits of Section 740 of Internal Revenue Code for acquiring or component corporation; however, the Commissioner of Internal Revenue has ruled differently in letter dated September 4, 1943. If the taxpayer is not entitled to relief under Section 740 of Internal Revenue Code then Item 5, Schedule B—Taxpayers entitled to the excess-profits credit based on income, covering other factors producing an average base period net income which is an inadequate standard of normal earnings should apply and relief granted under Section 722 and computed as shown in Item 6 of Schedule A of this claim under Section 722 Internal Revenue Code. See Exhibit A, Summary of Net Income from business acquired and the following computation of constructive base period net income.

SCHEDULE A—CONSTRUCTIVE BASE PERIOD NET INCOME

*Item 6—Amount of Constructive average base period net Income claimed for use in computing excess-profits tax for taxable year using provisions and methods of Section 740 Internal Revenue Code*

Applying Section 713 (e) (1), relating to exclusion of Deficit or to increase in lowest year in base period, to net income from Business Acquired during period 1936–1942. See Exhibit A.

|  | Net income constructed | Eliminate lowest year | Substitute |
|---|---|---|---|
| Year ended June 30, 1937 | $505, 473. 05 | $505, 473. 05 | $505, 473. 05 |
| Year ended June 30, 1938 | (154, 007. 11) | ------------ | 249, 777. 55 |
| Year ended June 30, 1939 | 222, 269. 48 | 222, 269. 48 | 222, 269. 48 |
| Year ended June 30, 1940 | 271, 367. 66 | 271, 367. 66 | 271, 367. 66 |
| Total | $845, 103. 08 | $999, 110. 19 | $1, 248, 887. 74 |
| Average net income | | $333, 036. 73 | $312, 221. 93 |
| | | 75% $249, 777. 55 | |

For the taxable years in issue petitioner filed various claims for refund of the excess profits taxes paid by it on Forms 843 which were received on the following dates:

| Fiscal year ended May 31 | Number of claims | Date received |
|---|---|---|
| 1943 | 3 | Sept. 9, 1944<br>May 28, 1947<br>Oct. 29, 1948 |
| 1944 | 2 | May 28, 1947<br>Oct. 29, 1948 |
| 1945 | 2 | May 28, 1947<br>Oct. 29, 1948 |
| 1946 | 2 | June 2, 1947<br>Oct. 29, 1948 |

On each of those claims petitioner referred to its applications for relief under section 722 as the basis for the refunds sought.

On February 19, 1947, petitioner was issued a 30-day letter, wherein it was notified that its applications for relief under section 722 had been rejected for the years 1943 through 1945.

The notice of disallowance of petitioner's applications for section 722 relief for the years ended May 31, 1943 through 1945, was mailed to petitioner on September 21, 1949. The notice of disallowance for the year ended May 31, 1946, was mailed on August 23, 1950. With the exception of $4,004.06, paid by petitioner in 1948 on account of its excess profits tax liability for the year ended May 31, 1943, the tax due for each of the taxable years ended May 31, 1943 through 1945, was paid more than 2 years prior to the mailing of the statutory notices of disallowance pertaining to those years.

Petitioner, by timely execution of Forms 872, extended the period of limitation for the assessment and collection of additional income and excess profits taxes for the taxable year ended May 31, 1946, to June 30, 1951.

On December 14, 1949, petitioner filed with this Court a petition for redetermination of its excess profits tax liability for the taxable years ended May 31, 1943 through 1945. Therein it set forth the factual circumstances of its acquisitions from Eisenmayer, Arkansas, and Majestic, and further alleged that there was a union of each of those entities into "an all-embracing whole" by virtue of which it was entitled, in computing its constructive base period net income, to use the base period income experience of each of those businesses. It then made the following allegation:

(q) By using the combined income and/or losses of Dixie Portland Flour Company, the petitioner, Arkansas City Flour Mills Company, Eisenmayer Milling Company, Majestic Flour Mill and C. B. Stout, doing business as Dixie-Portland Flour Mills, the constructive average base period net income which petitioner is entitled to use under Section 722 (b) (4) and (5) of the Internal Revenue Code amounts to $312,221.93. Petitioner computes said constructive average base period net income to which it is entitled under Section 722 of the Internal Revenue Code as follows:

Amount of Constructive average base period net income claimed for use in computing excess profits tax for taxable year using provisions and methods of Section 740 Internal Revenue Code.

Thereafter followed a computation which was similar in all respects to that which was set forth in the "General Comments" attached to its applications for relief under section 722.

On February 5, 1958, petitioner, with leave of the Court, amended its petition filed December 14, 1949, specifically alleging that it was an acquiring corporation within the meaning of sections 740 and 742 of the 1939 Code and therefore entitled to refunds of excess profits taxes paid for the years ended May 31, 1943 through 1945.

OPINION.

At the outset we are confronted with a question of jurisdiction; that is, whether, in a proceeding arising under section 732 of the 1939 Code by reason of respondent's disallowance of petitioner's claims for section 722 relief, this Court has jurisdiction of a so-called standard issue—in this case, the "acquiring corporation" issue under sections 740 and 742. In *Mutual Lumber Co.*, 16 T. C. 370 (1951), we expressed the opinion that in such circumstances we lacked jurisdiction over the standard issue, a position we have consistently followed. Just as consistently, however, we have been reversed on this point by various Courts of Appeals. *Commissioner* v. *Seminole Mfg. Co.*, 233 F. 2d 395 (C. A. 5, 1956); *Commissioner* v. *Blue Diamond Coal Co.*, 230 F. 2d 312 (C. A. 6, 1956); *Commissioner* v. *S. Frieder & Sons Co.*, 228 F. 2d 478 (C. A. 3, 1955); *Commissioner* v. *Poe Manufacturing Co.*, 224 F. 2d 254 (C. A. 4, 1955), reversing and remanding T. C. Memo. 1954–158; *Martin Weiner Corp.* v. *Commissioner*, 223 F. 2d 444 (C. A. 2, 1955), reversing and remanding 21 T. C. 470; *Commissioner* v. *Pittsburgh & Weirton B. Co.*, 219 F. 2d 259 (C. A. 4, 1955), reversing and remanding 21 T. C. 888; *Willys-Overland Motors* v. *Commissioner*, 219 F. 2d 251 (C. A. 6, 1955); *Packer Pub. Co.* v. *Commissioner*, 211 F. 2d 612 (C. A. 8, 1954), remanding 17 T. C. 882 (1951); *Claremont Waste Mfg. Co.* v. *Commissioner*, unreported (C. A. 1, 1952); *City Machine & Tool Company* v. *Commissioner*, 194 F. 2d 535 (C. A. 6, 1952); *H. Fendrich, Inc.* v. *Commissioner*, 192 F. 2d 916 (C. A. 7, 1951).

Even though not directly raised by the parties, we recognize that courts ordinarily decide jurisdictional questions on their own motion before cases are reached on their merits. In view of the situation described above, however, we prefer not to meet the jurisdictional issue if possible to avoid it, and in view of the disposition hereafter made of this case, we do not find it necessary to decide the question.

The petitioner claims that by virtue of its acquisitions from Majestic, Eisenmayer, and Arkansas, it was an "acquiring corporation" within the applicable provisions of section 740 (a) of the 1939 Code [1]

---

[1] SEC. 740. DEFINITIONS.

For the purposes of this Supplement—

(a) ACQUIRING CORPORATION.—The term "acquiring corporation" means—

(1) A corporation which has acquired—

\* \* \* \* \* \*

(D) substantially all the properties of a partnership in an exchange to which section 112 (b) (5), or so much of section 112 (c) or (e) as refers to section 112 (b) (5), or to which a corresponding provision of a prior revenue law, is or was applicable.

\* \* \* \* \* \*

(2) A corporation which has acquired property from another corporation in a transaction with respect to which gain or loss was not recognized under section 112 (b) (6) of Chapter 1 or a corresponding provision of a prior revenue law;

(3) A corporation the result of a statutory merger of two or more corporations; or

(4) A corporation the result of a statutory consolidation of two or more corporations.

and thereby entitled, under section 742[2] to utilize the earnings experience of those businesses in computing its excess profits credit based on income under section 713 (a). Should it be held that petitioner is not entitled to the benefits of section 740 *et seq.*, we must then consider whether it qualifies for relief under section 722 (b) (5) of the Code.[3]

Respondent attacks petitioner's position on all fronts. He argues that petitioner is not entitled to utilize the base period experience of Majestic in computing its excess profits credit principally because it did not acquire "substantially all" the assets of that concern as required by section 740 (a) (1) (D). He further submits that the requirements of section 112 (b) (5)[4] were not met, inasmuch as petitioner's notes, given in exchange for certain of Majestic's assets, did not constitute "stock or securities" within the meaning of that section and because the transferor, Majestic, was not in control of the transferee, petitioner, immediately after the transfer. In light of the fact that petitioner's excess profits credit, computed under the invested capital method is higher than it would be computed under the income method based on the earnings experience of Eisenmayer and Arkansas alone, respondent concludes that petitioner's claims for refund as an "acquiring corporation" must be denied.

---

[2] SEC. 742. SUPPLEMENT A AVERAGE BASE PERIOD NET INCOME.

In the case of a taxpayer which is an acquiring corporation, its average base period net income (for the purpose of the credit computed under section 713) shall be the amount computed under section 713 or the amount of its Supplement A average base period net income, whichever is the greater. * * *

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

* * * * * * *

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor.

In the event it should be found that the Majestic acquisition falls within the purview of the statute, respondent contends that petitioner may not utilize any of the earnings experience of Eisenmayer in computing its excess profits tax credit, and further, that all of Arkansas' base period earnings prior to February 4, 1940, must be excluded in computing that credit. He maintains that the transactions between petitioner and Eisenmayer did not constitute a Supplement A transaction, inasmuch as no properties were transferred to petitioner and no statutory merger or consolidation as provided in section 740 (a) (3) or (4) occurred. With respect to the Arkansas transaction, he claims that section 742 (f) (1)[5] requires that its base period earnings prior to February 4, 1940, must be excluded in computing petitioner's credit to prevent duplication of base period experience. He argues that duplication would occur because petitioner used its own cash, which is presumed to have contributed to its own base period experience, to acquire all Arkansas' stock on February 4, 1940, and then acquired all of Arkansas' assets on July 31, 1942, in exchange for that stock.

In any event, respondent argues that petitioner's claim for refund under the provisions of section 740 *et seq.*, for its taxable years ended May 31, 1943 through 1945, are barred by section 322 (b) (1) of the Code which provides, in the case of a taxpayer filing a return, that no credit or refund of tax is allowable unless a claim for such credit or refund is filed either within 3 years from the filing of the return or within 2 years from the payment of the tax, whichever is later. Respondent's position is that petitioner first indicated that it was claiming the benefits of section 740 *et seq.* in the amendment to its petition for the taxable years 1943 through 1945, which amendment was filed on February 5, 1958, at which time the statutory period for claiming any refund had clearly expired.

Finally, respondent maintains that since petitioner is not entitled to relief under section 740 *et seq.*, it is not entitled to utilize the methods provided by those sections to reconstruct its base period net income under section 722 (b) (5).

For reasons hereinafter apparent, we first consider petitioner's contentions that the Majestic transaction qualified it for excess profits

[5] SEC. 742. SUPPLEMENT A AVERAGE BASE PERIOD NET INCOME.

(f) (1) If, after December 31, 1935—

(A) the taxpayer acquired stock in another corporation, and thereafter such other corporation became a component corporation of the taxpayer, * * *

* * * * * * *

then to the extent that the consideration for such acquisition was not the issuance of the taxpayer's * * * own stock, the Supplement A average base period net income of the taxpayer shall be reduced, and the transferred capital addition and reduction adjusted, in respect of the income and capital addition and reduction of the corporation whose stock was so acquired * * * in such amounts and in such manner as shall be determined in accordance with regulations prescribed by the Commissioner with the approval of the Secretary. * * *

tax relief as an "acquiring corporation" within the meaning of section 740 (a) (1) (D) of the Code.

The section 740 issue was raised by petitioner by an amendment to the petition and petitioner has the burden of proof. As we said in *R. & J. Furniture Co.*, 20 T. C. 857, reversed on another ground 221 F. 2d 795 (C. A. 6, 1955) :

For petitioner to prevail, the transaction by which it acquired its initial assets must be shown to have been such as to qualify petitioner as an "acquiring corporation" within the meaning of section 740 (a) (1) (D) of the Internal Revenue Code. So to qualify, two statutory prerequisites must be met. First, petitioner must have acquired "substantially all" of the properties of the partnership. Second, the transfer wherein such acquisition was achieved must have constituted an exchange to which the provisions of section 112 (b) (5) of the Code, "* * * or so much of section 112 (c) or (e) as refers to section 112 (b) (5), or to which a corresponding provision of a prior revenue law, is or was applicable."

The question posed as to whether petitioner acquired "substantially all" of the partnership's properties is essentially one of fact to be resolved as an ultimate conclusion based upon the peculiar facts and circumstances attending the transfer with which we are concerned. Cf. *Peabody Hotel Co.*, 7 T. C. 600. The important factors to be considered in arriving at such conclusion include the nature of the properties retained by the partnership, the purpose for which they were so retained, and the amount thereof. *Milton Smith*, 34 B. T. A. 702. As we said in *Daily Telegram Co.*, 34 B. T. A. 101, at page 105:

"The term 'substantially all' is a relative term, dependent on the facts of any given situation. It is obvious that what might in one case, with a certain total of property involved, constitute substantially all of such property, might be but a small part of the total property involved in another case. In the present case a reading of the instrument in question leaves one with the impression that petitioner undertook to transfer substantially all of its properties. The evidence is that the agreement was substantially carried out and that thereafter petitioner had only 'a few thousand dollars in real estate properties * * *.' This was the testimony of one of the two owners of petitioner, who was also a party to the agreement. Giving this expression its normal meaning and considering the total amount of property involved, we have concluded and found as a fact that the new corporation acquired substantially all of the properties of petitioner. * * *"

And see *Daniels Buick, Inc.*, 26 T. C. 894, affd. 251 F. 2d 528 (C. A. 6, 1958).

Immediately prior to the transaction here, Majestic possessed current assets valued at $391,557.46, fixed assets having a depreciated book value of $166,622.75, and liabilities of $124,075.04. On May 31, 1942, all its current assets, consisting of cash, accounts receivable, inventories, and prepaid expenses were transferred to petitioner in consideration of the assumption of Majestic's liabilities and issuance of a 10-year debenture note in the principal amount of $267,482.42. All Majestic's fixed assets, consisting of land, buildings, operating machinery and equipment, office equipment, and vehicles were retained. Thereupon, Majestic granted petitioner a lease of the retained land and buildings for a 5-year term, and of the remainder

of the retained assets for a 10-year term. Two months later, in July 1942, Majestic sold to parties not involved herein, certain retained assets for $160,000 cash. Then, in October 1942, approximately 5 months after the initial transaction, Majestic transferred to petitioner the sum of $150,000 in exchange for petitioner's notes in like amount. During December 1942 and April 1943 petitioner purchased additional assets from Majestic for $25,241.40, an amount equivalent to their cost basis in the latter's hands. The balance of Majestic's assets, valued at $3,718.09, was sold to parties not material hereto prior to November 1944 for $9,850. Majestic was dissolved on June 30, 1947.

It is apparent that petitioner did not acquire "substantially all" the properties of Majestic by virtue of the May 31 transaction. At that time Majestic transferred only its current assets to petitioner, which comprised approximately 70 per cent of its total assets. However, it retained all its operating assets, consisting of land, machinery, and equipment, which presumably were the principal contributors to Majestic's base period experience. While petitioner did acquire temporary use of these retained properties through 2 short-term leases, this was far short of the lessor's fee interest therein. *Daniels Buick, Inc., supra.*

However, petitioner contends that as of May 31, 1943, the partnership had disposed of all its assets except property having a value of $3,718.09, and that by the "nontaxable" transactions of May and October 1942, it had acquired all except $28,959.49 of those assets. Thus it would include within the "transfer," not only the transaction of May 31, but also the transactions of October 1942.

Whether a series of steps is to be considered as a single indivisible unit, or whether each step should retain its separate identity, is generally determined by their mutual interdependence; that is to say, were the steps so mutually interdependent that the legal relationships created by one would have been fruitless without the completion of the series. *American Wire Fabrics Corporation,* 16 T. C. 607 (1951); *American Bantam Car Co.,* 11 T. C. 397 (1948), affd. 177 F. 2d 513 (C. A. 3); *Illinois Water Service Co.,* 2 T. C. 1200 (1943). Respondent argues that this record fails to reveal any relationship between the May 31 transaction and the subsequent transfers in October. He submits that the latter merely represented a partnership investment of $150,000 in the petitioner. On the other hand, petitioner argues that where the essential nature of a transaction is the acquisition of property, closely related steps will not be separated at the instance of either party. It relies primarily on *A. C. Burton & Co. v. Commissioner,* 190 F. 2d 115 (C. A. 5, 1951), reversing and remanding 14 T. C. 290.

Petitioner has failed to establish any connection between the May transfer and the October transactions. We have been shown no plan of liquidation or acquisition which would justify our fusing the two into one indivisible transaction. While the record reveals the chronology and details of the steps taken, it does not indicate the motives which engendered them. The May 29 agreement simply recited that Majestic would *sell* to petitioner all its current assets, and would lease to it all its fixed assets, which in fact is what transpired. The cases relied upon by petitioner to sustain its argument that the instant steps were mutually interdependent all involved definite plans of action which contemplated each of the component steps which ultimately were taken. That has not been shown to have been the case here. In point of fact, these subsequent sales of property by the partnership to others and the transfer to petitioner of the cash received in exchange for petitioner's notes, seem to be more in the nature of afterthoughts rather than predetermined acts on the parts of the parties. We are unable to find, on this record, that the October transactions were mutually interdependent steps in an overall plan calling for the acquisition of Majestic's properties by petitioner. This reasoning applies equally to the acquisitions of December 1942 and April 1943 whereby petitioner purchased additional assets from Majestic for the total amount of some $25,000.

We conclude that petitioner did not acquire "substantially all" the properties of Majestic. Hence, it was not an "acquiring corporation" within the meaning of section 740 (a) (1) (D) with respect to the Majestic transaction, and may not now utilize Majestic's base period income experience in computing its excess profits tax credit.

Even if we view the various transactions as part of an overall plan we do not think petitioner has demonstrated that it acquired "substantially all the properties" of Majestic. As shown by our findings most of the fixed assets were in fact disposed of to outside parties and never were transferred to petitioner at all, albeit most of the cash received was afterwards transferred to petitioner and its debenture notes taken back. These were loans and not exchanges of assets for securities. See *Harry F. Shannon*, 29 T. C. 702.

Furthermore, we think that petitioner must also fail on this point because the properties transferred to petitioner were not transferred to it "solely in exchange for stock or securities" in petitioner, as required by section 112 (b) (5). Majestic received no stock whatever in petitioner as a result of the transfer. When the smoke blew away Majestic had received only three 10-year debenture notes in the amounts of $267,482.42, $100,000, and $50,000. In interpreting the terms "solely for stock or securities" in connection with determining whether a tax-free reorganization had taken place, the Supreme Court in *LeTulle* v. *Scofield*, 308 U. S. 415, said:

Where the consideration is wholly in the transferee's bonds, or part cash and part such bonds, we think it cannot be said that the transferor retains any proprietary interest in the enterprise. On the contrary he becomes a creditor of the transferee; * * *

The major transaction was characterized by the parties to it as a "sale" in the documents which are in evidence, and we think that is what it was. The debenture note taken for the purchase price did not give the "transferring" partnership any proprietary interest in petitioner and we hold that petitioner was not an "acquiring" corporation within the meaning of the reorganization sections of the statute. Whatever proprietary interest the transferring parties had in the petitioner after the transactions were there because of their prior stock interest in petitioner and did not result from the transfers under consideration. Petitioner has not sustained its burden of proving that it was a tax-free exchange. See *Harry F. Shannon, supra.*

Since petitioner's excess profits tax credit computed under the invested capital method is higher than it would be computed under the income method based on its own base period earnings experience, and that of Eisenmayer and Arkansas, it is unnecessary to consider the alternative arguments dealing with the Eisenmayer and Arkansas transfers. Nor need we consider respondent's contentions that petitioner's claims for refund as an "acquiring corporation" for its taxable years 1943 through 1945 were not timely filed.

Finally, we turn to petitioner's claims for relief under section 722 (b) (5). Its position is that it is entitled to relief under that section "to prevent the discriminatory and excessive tax on the combined income of properties of petitioner itself, plus Eisenmayer * * * Arkansas * * * and Majestic * * * which results, unless petitioner is allowed to use the average base period net income of the entities * * * in computing excess profits tax credit for the years here involved."

In short, petitioner's contention apparently is that having failed to qualify as an "acquiring corporation" it nevertheless is entitled to relief under section 722 (b) (5), and that the amount thereof is to be computed under section 722 just as it would have been entitled to compute it under sections 740 and 742 had it been found to be an "acquiring corporation" under those sections.

Petitioner fails on brief to compute a fair and just amount representing normal earnings to be used as a constructive average base period net income figure, apparently relying upon the computations contained in its petitions and applications for relief under section 722. In those computations it arrives at a constructive average base period net income figure of $312,221.93 to which it claims it is en-

titled under the provisions of section 722 (b) (5). It prefaces the computations wherein that figure was determined with the following remarks:

Amount of Constructive Average base period net income claimed for use in computing excess-profits tax for taxable year using provisions and methods of Section 740 Internal Revenue Code

Thereafter it computes its constructive average base period net income, utilizing the combined net income of Majestic, Arkansas, and Eisenmayer. Assuming those computations are properly before us, they must be rejected.

Section 742 and the regulations promulgated thereunder [6] permit a taxpayer, which is an "acquiring corporation," to compute its average base period net income, for the purposes of the excess profits credit based on income, either under Supplement A or under section 713, whichever produces the greater credit. Section 722 (e) [7] permits a taxpayer, whose average base period net income has been computed under Supplement A, to treat the base period income experience of its components as its own for the purpose of reconstructing its average base period net income in order to determine its excess profits credit under section 713. It is obvious, after a consideration of these statutory provisions, that Congress granted the privilege of utilizing the base period experience of other business entities only to those taxpayers qualifying as "acquiring corporations" under the provisions of Supplement A, whether relief was sought under section 740 *et seq.*, or under section 722.

Accordingly, since we have held that petitioner was not an "acquiring corporation" under Supplement A with respect to the Majestic

---

[6] SEC. 742. SUPPLEMENT A AVERAGE BASE PERIOD NET INCOME.

In the case of a taxpayer which is an acquiring corporation, its average base period net income (for the purpose of the credit computed under section 713) shall be the amount computed under section 713 or the amount of its Supplement A average base period net income, whichever is the greater. * * *

Regulations 112:

SEC. 35.742-1. GENERAL RULES FOR DETERMINING SUPPLEMENT A AVERAGE BASE PERIOD NET INCOME.—(a) *Introductory.*—In the case of an acquiring corporation which was actually in existence before January 1, 1940, its average base period net income, for the purposes of the excess profits credit based on income, shall be (1) the amount computed under section 713 with reference to its base period experience but without reference to the base period experience of its component corporations; or (2) the amount of its Supplement A average base period net income, computed under section 742 with reference to its base period experience and also with reference to the base period experience of its component corporations, whichever of such amounts is the greater. * * *

[7] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(e) RULES FOR APPLICATION OF SECTION.—For the purposes of this section—

* * * * * * *

(2) in the case of a taxpayer, the average base period net income of which is computed under Supplement A, for the period for which the income of any other person is included in the computation of the average base period net income of the taxpayer, the taxpayer shall be treated as if such other person's business were a part of the business of the taxpayer.

transactions, it may not now utilize the base period experience of that entity in computing its constructive average base period net income under the provisions of section 722 (b) (5). As noted above, petitioner's excess profits credit computed under the invested capital method is higher than it would be computed under the income method based on its own base period earnings plus that of Eisenmayer and Arkansas. Even assuming that petitioner was otherwise qualified under 722 (b) (5) it has not shown that it would be entitled to relief under section 722.

Petitioner has neither proved nor presented any other factors which would entitle it to relief under section 722 and respondent's rejection of its claims thereunder is sustained.

Reviewed by the Special Division as to the section 722 issue.

*Decision will be entered for the respondent.*